# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

WELLGISTICS, LLC,    )
    )
    Plaintiff/counterclaim    )
    defendant,    )    C.A. No.: N22C-08-182 KMM
    )
    v.    )
    )
WELGO, INC.,    )
    )
    Defendant/counterclaim    )
    plaintiff.    )

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

WELGO, INC.,    )
    )
    Petitioner,    )
    )    C.A. No.: 2024-0342-KMM[1]
    v.    )
    )
    )
WELLGISTICS, LLC,    )
    )
    Respondent.    )
    )

Submitted: July 11, 2024
Decided: September 27, 2024
Corrected: November 25, 2024[2]

---

[1] Sitting as a Vice Chancellor in the Court of Chancery of the State of Delaware by designation of the Chief Justice of the Supreme Court of Delaware pursuant to *In re: Designation Of The Honorable Kathleen M. Miller under Del. Const. art. IV § 13(2)* dated April 9, 2024.

[2] Corrected footnotes 130 and 132.

*Upon Wellgistics, LLC's Motion to Dismiss Welgo, Inc.'s Third Amended Counterclaim*: **GRANTED**

*Upon Wellgistics, LLC's Motion to Strike Welgo, Inc.'s Affirmative Defenses*: **GRANTED**

*Upon Wellgistics, LLC's Motion to Dismiss Welgo, Inc.'s Petition:* **GRANTED**

Chad S.C. Stover, Esquire, Amy E. Tryon, Esquire, Barnes & Thornburg LLP, Wilmington, Delaware, Marc S. Silver, Esquire (*pro hac vice*) (*argued*), Christine E. Skoczylas, Esquire (*pro hac vice),* Barnes & Thornburg LLP, Chicago, Illinois, *Attorneys for Wellgistics, LLC*.

Basil C. Kollias, Esquire, Gordon L. McLaughlin, Esquire, Kollias Law, LLC, Wilmington, Delaware, Geri Lyons Chase, Esquire (*pro hac vice*) (*argued*), Law Office of Geri Lyons Chase, Annapolis, Maryland, *Attorneys for Welgo, Inc.*

**MILLER, J.**

## I. INTRODUCTION

Welgo, Inc. ("Welgo") generated revenue through its wholly-owned subsidiary, Welgo, LLC, which sold prescription medications. Welgo, LLC had negotiated favorable contracts with distributors for certain medications. Prior to Wellgistics, LLC's ("Wellgistics") investment in Welgo, Welgo, LLC's distributor contracts were disclosed to Wellgistics.

Welgo alleges that after the identity of Welgo, LLC's distributors and its high-profit prescription medications were disclosed to Wellgistics, it improperly used this confidential information to begin purchasing large quantities of these medications. Wellgistics' sharp increase in purchases substantially contributed to an increase in the national utilization rate, causing insurance companies to curtail or stop covering the medications. This, in turn, caused Welgo, LLC's physician-customers to substantially reduce the amount of these medications they dispensed to their patients, resulting in lost revenue for Welgo, LLC and ultimately, Welgo.

Welgo further alleges that just days after the identity of Welgo, LLC's distributors were disclosed to Wellgistics, the distributors sold their rights in these medications to third-parties. The new distributors increased the price, cutting into Welgo, LLC's profit margin. The new owners aggressively marketed the medications, which also contributed to the increase in the national utilization rate and the attendant loss of revenue for Welgo, LLC. Additionally, Wellgistics'

increased purchases of these medications prompted other companies to jump into the market, further contributing to the increase in national utilization rate.

In response to Wellgistics' debt action filed in the Superior Court seeking to recover amounts due under a promissory note, Welgo filed its Third Amended Counterclaim[3] ("TAC") asserting claims for breach of contract (Count I), breach of fiduciary duty (Count II), tortious interference with contract (Count III), fraud (Count IV), and estoppel (Count V). Welgo's answer asserts affirmative defenses of fraud and estoppel. Welgo also filed a Court of Chancery action, asserting a claim for breach of fiduciary duty. The Court of Chancery and the Superior Court claims (and affirmative defenses) rest on the same factual predicate described above.

Wellgistics filed motions to dismiss the TAC[4] and the Court of Chancery[5] action, pursuant to Superior Court Civil Rules 12(b)(1), 12(b)(6) and 9(b) and Court of Chancery Rule 12(b)(6), asserting that Welgo lacks standing and failed to adequately plead the causes of action. Wellgistics also filed a motion to strike Welgo's affirmative defenses, pursuant to Rules 8(a), 8(c), 9(b), and 12(f).[6]

The TAC asserts a breach of fiduciary duty claim (Count II) despite that claim previously being dismissed for lack of jurisdiction. There is no basis for jurisdiction

---

[3] Welgo's Second Amended Counterclaim was dismissed on January 9, 2024 (D.I. 44), with leave to amend.
[4] D.I. 59.
[5] D.I. 6.
[6] D.I. 60.

over this claim in the Superior Court. For the reasons stated in this Court's November 29, 2023 Order,[7] Count II is **DISMISSED**.

Although the TAC asserts substantially more facts than the previously dismissed Second Amended Counterclaim, the TAC fails to adequately plead the asserted causes of action. Likewise, the Court of Chancery complaint fails to adequately plead a claim for breach of fiduciary duty. Therefore, Wellgistics' motions are **GRANTED**.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. *The parties and relevant non-parties*

#### 1. *Welgo and related non-parties*

Welgo is a holding company, owning 100% of Welgo, LLC from its formation until March 2023.[8] Michael Lion ("Lion") and Keith Holdan ("Holdan") each owned 50% of Welgo's stock at its formation in 2018.[9]

Welgo, LLC is a specialty prescription medication wholesaler. In 2019, its business model focused on selling a limited number of medications, but with high profit margins.[10] To that end, it contracted with distributors for the purchase of

---

[7] D.I. 42.
[8] TAC (D.I. 48), ¶ 4; Court of Chancery complaint ("CC Com."), ¶ 13.
[9] TAC, ¶ 14.
[10] TAC, ¶ 5; CC Com., ¶ 14.

certain medications at favorable prices[11] and sold them to physicians, who dispensed the medications directly to their patients.[12]

On March 30, 2023, Welgo sold its interest in Welgo, LLC to an unrelated third-party.[13]

### 2. Welgo, LLC's distributors

Prior to the events with Wellgistics, Welgo, LLC contracted with Athena Bioscience LLC ("Athena") to purchase Naprosyn Oral Solution.[14] Athena was the exclusive distributor for this product in the United States.[15] Philip Volt is the Chief Operating Officer of Athena.

Also prior to the events with Wellgistics, Welgo, LLC contracted with Crown Laboratories, Inc. ("Crown") to purchase Ala-Scalp and Ala-Quin.[16] David Arapakes ("Arapakes") is the business development manager at Crown.

### 3. Wellgistics and related parties

Wellgistics, also a specialty prescription medication wholesaler, sells primarily to independent pharmacies.[17] Wellgistics is a much larger wholesaler than Welgo, LLC.[18] However, Wellgistics is much smaller than the large national

---

[11] *Id.*
[12] *Id.*
[13] D.I. 71.
[14] TAC, ¶ 6; CC Com., ¶ 15.
[15] CC Com., ¶ 7.
[16] TAC, ¶ 13.
[17] *Id.*, ¶ 18.
[18] TAC, ¶ 61.

wholesalers, such as AmerisourceBergen, Cardinal Health, and McKession, that control 90% of the wholesale market in the United States.[19]

Wellgistics encourages its pharmacy-customers to hire sales personnel to market the medications sold by Wellgistics and promises to pass-on discounts to the pharmacies.[20]

Charles Jenkins ("Jenkins") is an Executive Vice President of Brand Strategy for Wellgistics.

Matthew Starley ("Starley") is the Chief Operating Officer and General Counsel for Wellgistics.

Michael Pearce ("Pearce") is a consultant for Wellgistics, charged with increasing its profitability.[21]

### 4. *Other non-parties*

Key Therapeutics, LLC ("Key") "labeled" the only authorized generic of Naprosyn Oral Solution in the period 2016 through October 2019.[22]

Marnel Pharmaceuticals, LLC ("Marnel"), owned by Jonathan Alba ("Alba"), is a prescription drug distributor.[23]

---

[19] TAC, ¶ 18; CC Com., ¶¶ 26, 27.
[20] TAC, ¶ 19.
[21] *Id.*, ¶ 32.
[22] *Id.*, ¶ 9; CC Com., ¶ 18.
[23] TAC, ¶¶ 28, 29.

Allegis Pharmaceuticals, LLC ("Allegis"), owned by Rett Crowder ("Crowder"), is a prescription drug distributor.[24]

Jamison Roberts ("Roberts") is an executive consultant for Allegis and also "work[s] closely" with Pernix Therapeutics Holdings, a company of which Pearce was the Chief Executive Officer.[25]

Crowder and Roberts formed Derm Ventures LLC ("Derm"), on September 29, 2019.[26]

### B.     *Welgo, LLC's contracts*

While the pill form of Naprosyn Oral Solution and its generic – Naproxen Oral Solution – was widely used in 2019, the oral solution had a low utilization rate (*i.e.*, low sales volume), because it serves a limited population — those who cannot swallow pills.[27] With few manufacturers and distributors of this medication, Welgo, LLC sought to take advantage of its high profit margin.[28] So, in 2019, it contracted with Athena to purchase generic Naprosyn Oral Solution on favorable pricing terms.[29]

---

[24] *Id.*, ¶¶ 29, 36.
[25] *Id.*, ¶ 36.
[26] *Id.*, ¶ 37.
[27] *Id.*, ¶ 63.
[28] *Id.*, ¶¶ 8-12. In 2019, there were only two manufacturers of this medication. *Id.*, ¶¶ 10, 63. *See also* CC Com., ¶¶ 17-21.
[29]TAC, ¶ 6; CC Com., ¶ 15.

Also in 2019, Welgo, LLC contracted with Crown to purchase Ala-Scalp and Ala-Quin (with Naprosyn Oral Solution, the "Products") on favorable pricing terms.[30] Like Naprosyn Oral Solution, Ala-Scalp and Ala-Quin had low utilization rates, but high profit margins.[31]

### C.  *Wellgistics buys 50% of Welgo's stock.*

Shortly after formation of Welgo, a conflict arose with Holdan who then sought to sell his interest in the company.[32] In July 2019, Lion met Jenkins, who indicated that Wellgistics may be interested in purchasing Holdan's Welgo stock.[33] Jenkins signed a confidentiality agreement, and discussions progressed.[34]

On September 24, 2019, Welgo and Welgo, LLC entered into a Mutual Confidentiality Agreement (the "MCA"), with Wellgistics, the "Purpose" of which was to exchange information "in connection with their discussions of a possible business relationship."[35] The MCA provides:

> During the term of this Agreement, and for a period of five (5) years thereafter, the Recipient shall keep confidential and shall not divulge the Disclosing Party's Confidential Information to any third party or *use such information other than for the Purpose*, without the prior written consent of the Disclosing Party.[36]

---

[30] TAC, ¶ 13; CC Com., ¶ 22.
[31] *Id.*
[32] TAC, ¶ 15; CC Com., ¶ 24.
[33]  TAC, ¶ 16; CC Com., ¶ 25.
[34] *Id.*
[35] TAC., ¶¶ 16, 26-27.
[36] *Id.*, Ex. D (emphasis added).

After further discussions, the parties agreed that Pearce would buy Holdan's stock and soon thereafter, transfer the shares to Wellgistics.[37] Accordingly, Pearce purchased Holdan's stock in October 2019. Wellgistics acknowledged that Pearce was its agent in this transaction and that Wellgistics funded the purchase.[38] Pearce joined Welgo's board of directors in November 2019.[39]

In December 2019, Pearce transferred the stock to Wellgistics, thus becoming a 50% owner of Welgo.[40]

## D.    *Wellgistics receives confidential information.*

As of September 2019, a substantial portion of Welgo, LLC's gross revenue was derived from selling the Products.[41] At the time, Welgo, LLC was servicing 21 physicians.[42] In 2020, it added the largest orthopedic practice in the United States to its customer base.[43] Welgo, LLC anticipated servicing an additional 100 physicians in each of 2021 and 2022.[44]

In due diligence in connection with the stock purchase, Wellgistics requested information about Welgo, LLC's products. Wanting to protect Welgo, LLC's

---

[37] *Id.*, ¶ 33; CC Com., ¶ 43.
[38] TAC, ¶¶ 32-33; CC Com., ¶¶ 42-43.
[39] TAC, ¶ 40; CC Com., ¶ 50.
[40] TAC, ¶ 49. The Complaint asserts that Wellgistics' interest in Welgo represented only a 40% stake. D.I. 1, ¶ 8. For purposes of the motion to dismiss, the Court must accept Welgo's allegation that Wellgistics held a 50% interest in the company.
[41] TAC, ¶ 31; CC Com., ¶ 41.
[42] TAC, ¶ 50; CC Com., ¶ 61.
[43] *Id.*
[44] *Id.*

business, Lion refused to disclose this information until a confidentiality agreement was executed.[45]

Once the MCA was executed on September 29, 2019, Wellgistics learned the identity of Welgo, LLC's distributors and the products it sold.[46] On October 4, 2019, Welgo, LLC's distributor contracts were provided to Wellgistics.[47] On October 7, 2019, Jenkins told Lion that Wellgistics was already "in the works with several of these."[48]

### E. *Distribution rights to the Products are transferred to third-parties, resulting in higher prices for Welgo, LLC.*

Shortly after execution of the MCA, Lion provided Jenkins with contact information for the business development manager at Crown (Arapakes). On October 2, 2019, Arapakes advised Lion that Crown changed its distribution process and Welgo, LLC now was required to purchase Ala-Scalp and Ala-Quin through a distributor - Marnel.[49] The result of this new arrangement was a higher product cost for Welgo, LLC: its profit margin on Ala-Scalp dropped from $165 per unit to $105, and on Ala-Quin, it dropped from $150 per unit to $75.[50]

---

[45] TAC, ¶ 26; CC Com., ¶ 36.
[46] *Id.*
[47] TAC, ¶ 30. Wellgistics also received "financial information, existing contracts, proprietary software, and other information critical to [Wellgistics'] consideration of its potential acquisition of a substantial stake in the company." *Id.,* ¶ 27.
[48] TAC, ¶ 34; CC Com., ¶ 44.
[49] TAC, ¶ 28; CC Com., ¶ 38.
[50] TAC, ¶¶ 41, 52; CC Com., ¶¶ 51, 63.

Alba (Marnel's owner), at some unidentified time, told Lion that Jenkins was Alba's college friend and his former employee.[51] Alba also told Lion that Marnel would be purchasing Ala-Scalp and Ala-Quin from Allegis and selling these products to Welgo, LLC.[52] It appears that Crown transferred its rights in these products to Allegis.[53]

Also in October 2019, Volt of Athena (Welgo, LLC's distributor for Naprosyn Oral Solution) told Lion that he (Volt) met with representatives of Wellgistics.[54] Shortly thereafter, Lion learned that Allegis also acquired the rights to sell Naprosyn Oral Solution.[55] Prior to this transaction, Welgo, LLC purchased the medication, manufactured by Key, for $925 per unit.[56] Allegis was now "relabeling" the product and selling it to Welgo, LLC for $1,135 per unit.[57]

When Lion learned of these transactions, he warned Wellgistics to "stay away" from Welgo, LLC's distributors because if the sales volumes increased, it would hurt his business.[58]

---

[51] TAC, ¶ 29; CC Com., ¶ 39.
[52] Id.
[53] TAC, ¶ 42 ("Lion learned from Jonathan Alba that after acquiring the Ala-Scalp and Ala-Quin products from Crown…").
[54] TAC, ¶ 35; CC Com., ¶ 45.
[55] Id.
[56] Id., ¶¶ 9-10, 35.
[57] TAC, ¶ 35; CC Com., ¶ 45.
[58] TAC, ¶ 38; CC Com., ¶ 48.

## F.  *Marnel aggressively markets Ala-Scalp and Ala-Quin.*

After obtaining the right to sell Ala-Scalp and Ala-Quin, Marnel and Allegis began aggressively marketing these products.[59]  As a result, the utilization rate increased, which caused Pharmacy Benefits Managers ("PBMs")[60] to discontinue reimbursements for Ala-Scalp in June 2020.[61]

## G.  *Other wholesalers enter the market.*

After PBMs stopped reimbursements for Ala-Scalp due to the much higher sales volume, Derm (apparently having entered the prescription drug wholesale market), introduced a dual-pack of Ala-Scalp, which contained two units.[62]  Because Ala-Scalp was traditionally sold in single-unit packs, the dual-pack was assigned a new "National Drug Code," essentially becoming a new product.[63]  As a new

---

[59] TAC, ¶ 42; CC Com., ¶ 52.

[60] PBM is a group of companies responsible for securing lower costs for insurance companies. *Id.*, ¶ 20.  PBMs track market data, including claims activity and available generic alternative medication. *Id.*  "When claims submissions increase on high-profit margin medication and national utilization rates increase for that specific medication or group of medications, PBM's [sic] advise the insurers to take one of several potential actions intended to reduce the amount of money paid by the insurers for the medications. These potential actions include requiring prior authorization of insurance coverage for a medication, reducing the share of the medication cost covered by the insurer, or removing the medication from the insurer's formulary (i.e., list of medications paid for by the insurer)." *Id.* at ¶ 62.

[61] TAC, ¶ 42; CC Com., ¶ 52.

[62] TAC, ¶ 44; CC Com., ¶ 54.

[63] *Id.*

product, utilization rates were low, so PBMs resumed reimbursements for Ala-Scalp.[64] Welgo, LLC did not sell a dual-pack.

In each of 2020, 2021, and 2022, the Food and Drug Administration (the "FDA") approved an additional generic drug manufacturer for Naproxen Oral Solution, thus doubling the number of companies selling this medication.[65]

**H.     *Wellgistics purchases large quantities of the Products, substantially contributing to an increase in the national utilization rate.***

Prior to September 2019, Wellgistics did not purchase a significant amount of the Products.[66] After the identities of Welgo, LLC's distributors were disclosed, Wellgistics began purchasing the Products in large quantities. In addition, Wellgistics encouraged its pharmacy-customers to conduct "test runs" on these medications and in turn, "sell" their customers (the patients) on Wellgistics' high-margin products.[67] Wellgistics used training videos to show the pharmacies how they could profit from this marketing strategy.[68]

When Welgo learned that Wellgistics' representatives contacted Welgo, LLC's distributors, Welgo and Welgo, LLC immediately demanded that Wellgistics "cease and desist" from interfering with Welgo, LLC's contracts and that Wellgistics

---

[64] *Id.*
[65] TAC, ¶ 11; CC Com., ¶ 20.
[66] TAC, ¶ 45; CC Com., ¶ 55.
[67] TAC, ¶ 64.
[68] *Id.*

13

discontinue its purchases of the Products.[69]  Welgo "unequivocally advised Wellgistics that Wellgistics' high-volume purchases of the aforesaid medications was a breach of the MCA and may result in a marked increase in national utilization classification for the medications, which would cause Welgo substantial economic harm."[70]  Despite these demands, Wellgistics "knowingly and intentionally" continued contacting Welgo, LLC's distributors and purchasing large quantities of the Products, knowing the detrimental impact it could have on Welgo, LLC's business.[71]

Wellgistics purchasing large quantities of the Products from Welgo, LLC's "contract manufacturers, other manufacturers, wholesalers or third-party logistics companies" and encouraging its pharmacy-customers to run test claims, caused an increase in the national utilization rates, consequently triggering scrutiny by the PBMs.[72]  As a result, in late 2020, PBMs limited approvals for Naprosyn Oral Solution and stopped reimbursements for Ala-Scalp and Ala-Quin.  Because the Products were no longer fully covered by insurance, Welgo, LLC's physician-customers substantially reduced the number of prescriptions they dispensed.

---

[69] TAC, ¶ 47; CC Com., ¶ 57.
[70] TAC, ¶ 47; CC Com., ¶ 57.
[71] TAC, ¶ 48; CC Com., ¶ 58.
[72] TAC, ¶ 65.

Instead, the physicians prescribed other medications that were covered by insurance, which Welgo, LLC did not sell.

### I.  *Wellgistics' Aberrant List medications*

CVS Caremark is one of the largest PBMs.[73]  In 2019, it created an "Aberrant List," a list of restricted medications, the purpose of which was to reduce the sales volumes and thus, save costs for its insurer-customers.  Medications were placed on this list due to their high-profit margins, among other reasons.[74]  Pharmacies were contractually bound to limit the amount of a medication on the Aberrant List they dispensed.[75]

Prior to 2019, Chlorzoxazone was one of Wellgistics' principal products, from which it derived substantial revenue.[76]  CVS Caremark placed Chlorzoxazone on the Aberrant List and stopped reimbursements due to its high cost.[77]  With the loss of revenue on Chlorzoxazone and its other products on the Aberrant List, Wellgistics needed to find other sources of revenue.[78]  This led to Wellgistics purchasing Welgo stock and purchasing large quantities of the Products.[79]

---

[73] TAC, ¶ 21; CC Com., ¶ 31.
[74] TAC, ¶ 23; CC Com., ¶ 33.
[75] *Id.*
[76] TAC, ¶ 22; CC Com., ¶ 32.
[77] TAC, ¶ 21; CC Com., ¶ 31.
[78] TAC, ¶ 25; CC Com., ¶ 35.
[79] *Id.*, ¶ 16.  None of Welgo, LLC's products were on the Aberrant List. *Id.,* ¶ 30. *See also* CC Com., ¶¶ 25, 40.

## J. *Welgo repurchases its stock from Wellgistics.*

By May 2020, Welgo and Wellgistics decided to part ways. Jenkins met with Lion to discuss "unwinding" the stock transaction. During this meeting, Jenkins made "assurances" to Lion that Wellgistics would "honor the cease and desist and would no longer sell" the Products.[80] In August 2020, Wellgistics and Welgo executed a Redemption Agreement and Welgo executed a Promissory Note (the "Note"), to purchase Wellgistics' interest in Welgo.[81]

The Redemption Agreement contains the following integration clause:

> **Entire Agreement.** This Agreement constitutes the entire understanding and agreement between the parties hereto with respect to the subject matter hereof, and any other written or oral agreement relating to the subject matter hereof existing between the parties are expressly canceled.[82]

Wellgistics' Complaint asserts a claim for breach of the Note because Welgo failed to make required payments.[83]

## K. *Welgo files the TAC and asserts the affirmative defenses.*

In the TAC, Welgo claims that Wellgistics breached the MCA by using confidential information regarding Welgo, LLC's profitable Products. The TAC also asserts claims for fraud and tortious interference with Welgo, LLC's distributor

---

[80] *Id.*, ¶ 102.
[81] *See* Complaint (D.I. 1) and TAC (D.I. 48).
[82] D. I. 59, Ex. 1, § 8.9.
[83] D.I. 1.

16

contracts. In each claim, Welgo asserts that it lost over $7.5 million dollars "in value" and revenue of $200,000 per month (or another $7.2 million as of the filing of the TAC).[84]

The TAC asserts a claim for estoppel, alleging that Welgo relied on Wellgistics' promise to stop selling the Products. Had Welgo known that Wellgistics would break its promise, Welgo would not have agreed to the Redemption Agreement and Note. Welgo seeks to be relieved of further payment obligations under the Note.

In Welgo's answer to the Complaint, it asserts affirmative defenses of fraud and estoppel, as follows:

FIRST AFFIRMATIVE DEFENSE – ESTOPPEL – "The plaintiff's conduct as set forth in the counterclaim appearing below is such that they be [sic] estopped from prosecuting this action;"[85]

SECOND AFFIRMATIVE DEFENSE – FRAUD – "the plaintiff's conduct/actions are as described in the [defendant's] counterclaim appearing below is such that the plaintiff's actions were fraudulent as to the defendant;"[86]

---

[84] D.I. 71.
[85] D.I. 48.
[86] *Id.*

## III. STANDARD OF REVIEW

The standard of review is the same under Superior Court Civil Rule 12(b)(6) and Court of Chancery Rule 12(b)(6): the Court accepts as true all well pleaded factual allegations and draws all reasonable inferences in favor of the non-moving party; the liberal construction afforded to a claimant does not "extend to 'conclusory allegations that lack specific supporting factual allegations;'" and dismissal will be denied if there is a reasonably conceivable set of circumstances of recovery on the claim.[87]

"A complaint that gives fair notice 'shifts to the [opposing party] the burden to determine the details of the cause of action by way of discovery for the purpose of raising legal defenses.'"[88]  Therefore, to avoid dismissal under Delaware's notice pleading standard, a party "need not plead evidence," but at a minimum, must "allege facts that, if true, state a claim upon which relief can be granted."[89]

Delaware law requires a claimant to plead fraud with particularity — a

---

[87] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Holdings LLC*, 27 A.3d 531, 535, 536-37, n.13 (Del. 2011) (the "'conceivability' standard is more akin to 'possibility,' while the federal 'plausibility' standard falls somewhere beyond mere 'possibility' but short of 'probability.'"); *Surf's Up Legacy Partners, LLC v. Virgin Fest, LLC*, 2021 WL 117036, at *6 (Del. Super. Jan. 13, 2021) (citation omitted); *In re Hennessy Cap. Acquisition Corp. IV S'holder Litig.*, 318 A.3d 306, 319-20 (Del. Ch. 2024).
[88] *VLIW Tech., LLC Hewlett-Packard Co.*, 840 A.2d 606, 611 (Del. 2003).
[89] *Id.*

heightened pleading standard[90] — even when asserted as an affirmative defense.[91]

To satisfy Rule 9(b), a fraud claim must allege: "(1) the time, place, and contents of the false representation; (2) the identity of the person making the representation; and (3) what the person intended to gain by making the representations."[92] "Essentially, the [claimant] is required to allege the circumstances of the fraud with detail sufficient to apprise the [opposing party] of the basis for the claim."[93]

The standard for a motion to strike is similar to that for a motion to dismiss.[94] Under Rule 12(f), the Court "may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."[95] "When ruling on a motion to strike, 'the Court must construe all facts in favor of the nonmoving party and deny the motion if the defense is sufficient under law.'"[96]

---

[90] Super. Ct. Civ. R. 9(b).

[91] *Commonwealth Const. Co. v. Cornerstone Fellowship Baptist Church, Inc.*, 2006 WL 2567916, at *25 (Del. Super. Aug. 31, 2006) ("Superior Court Civil Rule 9(b) requires that '[i]n all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity.' Such particularity requires, even where fraud is pled as an affirmative defense, that the party averring fraud must provide the time, place and contents of the fraudulent act or omission, as well as the person who gave the false representation.").

[92] *Medlink Health Sols., LLC v. JL Kaya, Inc.*, 2023 WL 1859785, at *2 (Del. Super. Feb. 9, 2023) (quoting *Abry Partners V, L.P. v. F&W Acquisition LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006)).

[93] *Id.*

[94] *Nat'l Amusements, Inc. v. Endurance Am. Specialty Ins. Co.*, 2023 WL 3145914, at *8 (Del. Super. Apr. 28, 2023) (citing *Nichols v. Chrysler Grp. LLC*, 2010 WL 5549048, at *5 (Del. Ch. Dec. 29, 2010)).

[95] Super. Ct. Civ. R. 12(f).

[96] *Nichols*, 2010 WL 5549048, at *5.

Motions to strike are disfavored and granted sparingly.[97] It is appropriate, however, to strike an affirmative defense that is legally insufficient.

## IV. DISCUSSION

### A. *The Superior Court claims*

#### 1. *Standing*

Wellgistics argues that Welgo lacks standing to assert its claims for breach of contract, tortious interference, and fraud[98] because Welgo, LLC entered into the contracts with the distributors and generated revenue from sales of the Products, and thus it (and not Welgo) suffered any alleged loss.[99] Welgo responds that it has standing because it is a party to the MCA and suffered an injury independent of Welgo, LLC.

"Standing" refers to the right of a person to invoke jurisdiction of the Court to redress its grievance. "The issue of standing is concerned 'only with the question of *who* is entitled to mount a legal challenge and not with the merits of the subject matter of the controversy.'"[100] When a defendant argues that the Court does not

---

[97] *Salem Church (Del.) Assocs. v. New Castle Cnty.*, 2004 WL 1087341, at *2 (Del. Ch. May 6, 2004).

[98] D.I. 59, pp. 17-20.

[99] Relying on *Tooley v. Donalson, Lufkin & Jenrette, Inc.,* 845 A.2d 1031 (Del. 2004) and *Acrisure Holdings, Inc. v. Frey,* 2019 WL 1324943 (D. Del. Mar. 25, 2019), Wellgistics asserts that Welgo is improperly attempting to convert a derivative claim into a direct claim. (D.I. 67 p. 7). Rather, disputes relating to commercial contracts, however, are not derivative claims. Derivative claims relate to breaches of fiduciary duties. *NAF Holding, LLC v. Li & Fung (Trading) Ltd.*, 118 A.3d 175, 179 (Del. 2015). Thus, Wellgistics' reliance on these cases is misplaced.

[100] *Albence v. Higgin*, 295 A.3d 1065, 1086 (Del. 2022) (emphasis in original) (citation omitted).

have authority to grant the requested relief to *any* plaintiff, standing is analyzed under Rule 12(b)(1).[101] However, where "the issue of standing is so closely related to the merits, a motion to dismiss based on lack of standing is properly considered under Rule 12(b)(6) rather than Rule 12(b)(1)."[102]

Here, as Wellgistics acknowledges, Welgo is a party to the MCA,[103] and as such, Welgo has standing to enforce *its* rights under the contract. Wellgistics' argument is that Welgo has not sufficiently alleged facts to state a claim. Therefore, Wellgistics' standing argument is more aptly addressed under Rule 12(b)(6) and the Court will do so.

### 2. *Breach of contract*

#### a. *The parties' contentions*

Wellgistics argues that the TAC fails to state a claim because Welgo has not alleged that it directly sustained damages from Wellgistics' alleged conduct. Additionally, even if Welgo suffered damages, its damages are "so untethered" from its breach of contract allegations that its causation theory is "hopelessly speculative."[104] Finally, Wellgistics argues that Welgo cannot isolate any damages

---

[101] *In re Covid-Related Restrictions on Religious Services*, 302 A.3d 464, 478 (Del. Super. 2023).
[102] *Appriva S'holder Litig. Co., LLC v. EV 3, Inc.*, 937 A.2d 1275, 1285-86 (Del. 2007); *In re Covid-Related Restrictions*, 302 A.3d at 478 (when the defendant is arguing that the court cannot grant relief to a plaintiff in a particular case because this particular plaintiff has not pleaded an essential element of the claim, the motion is properly decided under Rule 12(b)(6)).
[103] D.I. 67, p. 5.
[104] D.I. 59, p. 21.

from Wellgistics' alleged breach of the MCA from its losses from other forces and therefore, Welgo's damages theory fails.

Welgo counters that its position in the TAC is clear – Wellgistics agreed not to use confidential information and breached that agreement when it used that information to earn a profit for itself.[105]  Further, Welgo argues that the TAC details facts showing Wellgistics started a "chain of causation" by (i) purchasing large quantities of the Products, and (ii) influencing various players in the pharmaceutical industry, including pharmacies, patients, and physicians, causing harm to Welgo.[106]

### b. *Analysis*

Under Delaware law,[107] a claimant asserting a breach of contract must allege: (1) the existence of a contract; (2) the breach of a contractual obligation; and (3) resulting damages.[108]  While damages may be pled generally, a factual basis to relate the alleged injury to the breach is required.[109]  Conclusory allegations of damages

---

[105] D.I. 66, p. 12.

[106] TAC, ¶ 65.

[107] The MCA provides that it is governed by New York law.  The parties, however, argue the motion under Delaware law.  Because the parties rely on Delaware law and there is no actual conflict with New York law on the elements of breach of contract, *see, e.g., inVentiv Health Clinical, LLC v. Odonate Therapeutics, Inc.*, 2021 WL 252823, at *4 (Del. Ch. Feb. 18, 2021) (applying New York law to breach of contract claim), the Court is applying Delaware law to the motion to dismiss.

[108] *VLIW Tech., LLC*, 840 A.2d at 612; *Anschutz Corp. v. Brown Robin Cap., LLC*, 2020 WL 3096744, at *9 (Del. Ch. June 11, 2020).

[109] *Cf. Phage Diagnostics, Inc. v. Corvium, Inc.*, 2020 WL 1816192, at *9 (Del. Super. Mar. 9, 2020).  The court in *Phage Diagnostics* found that while damages may be pled generally even in fraud claims, a plaintiff "must relate its alleged injury to the misrepresentations that constitute its grounds for fraud such that the issue of damages may be inferred from the complaint."  While

22

are insufficient.[110]

The TAC satisfies the first pleading requirement — the existence of a contract. Welgo is a party to the MCA.

Under the MCA, Wellgistics had a duty only to use confidential information for the possible purchase of Welgo stock.[111]  The TAC alleges that Lion disclosed the identity of Welgo, LLC's products and provided Welgo, LLC's distribution contracts to Wellgistics.[112]  While more than one entity within an organization may have an interest in the same confidential information, "[g]enerally, 'a parent corporation does not, by reason of owning the stock of a subsidiary alone, own or have legal title to the assets of the subsidiary.'"[113]  Thus, under the general rule, a parent does not have a claim for improper disclosure of confidential information belonging to a subsidiary.[114]

While the TAC alleges that Welgo disclosed confidential information,[115] there are no factual allegations to substantiate this assertion.  Indeed, the TAC makes clear

Welgo's claim is for breach of contract, the same pleading standard applies – a claimant must allege facts relating the alleged injury to the breach.
[110] *Id.*
[111] TAC, Ex. D, ¶ 1.
[112] CC Com., ¶ 36.
[113] *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 869 (Del. Ch. 2022) (quoting 1 Fletcher Cyclopedia L. Corps. § 26).
[114] *Id.*
[115] *See* TAC, ¶ 58 (Wellgistics breached the MCA by using the information disclosed by Welgo, Inc. concerning Welgo's profitable contracts…") and ¶ 68 ("Wellgistics' use of Welgo, Inc. and Welgo, LLC's confidential information …).

that the confidential information — the contracts and the Products — belonged to Welgo, LLC.  The Court need not accept conclusory allegations and  there are no well pled allegations that *Welgo* disclosed its confidential information to Wellgistics.  Accordingly, Welgo failed to sufficiently plead a breach of the MCA for which it may seek redress.

Even if the Court construed the TAC as pleading that Welgo also held an interest in Welgo, LLC's confidential information, the TAC fails to sufficiently plead the third element — damages.[116]

The TAC alleges that Wellgistics used confidential information to purchase large quantities of (and aggressively marketed) the Products, driven by its need to generate revenue after Chlorzoxazone was added to the Aberrant List.  Wellgistics' purchases alone, however, did not cause such an increase in the national utilization rate to prompt action by the PBMs.  Other wholesalers jumped into the market for the Products, allegedly due to Wellgistics' sales and together, caused the PBMs to take action.  But, there are no factual allegations in the TAC that these other entities

---

[116] Relying on *Tanner v. Exxon Corp.*, 1981 WL 191389 (Del. Super. July 23, 1981) and *Deville Court Apartments, L.P. v. Fed. Home Loan Mortg. Corp.*, 39 F. Supp. 2d 428 (D. Del. 1999), Wellgistics argues that Welgo has not alleged damages with "reasonable certainty." D.I. 59, p. 21. The court in *Tanner* ruled that to recover on a breach of contract claim, the plaintiff must *prove* its damages with reasonable certainty, as opposed to damages based on speculation. *Id.* at *1.  The court in *Deville* denied a motion for summary judgment due to a dispute of material fact concerning the cause of plaintiff's alleged damages.  Neither court required the plaintiff to *plead* damages with specificity or to *plead* evidence.  Thus, Wellgistics seeks to hold Welgo to a higher pleading standard, which the Court will not do.

were even aware of Wellgistics selling the Products. Further, even if others knew what products Wellgistics was selling, there are no factual allegations as to how Wellgistics, a small player in the U.S. market,[117] could influence other companies to enter the market or cause (or cause the need for) the FDA's approval of additional generic manufacturers for Naproxen Oral Solution, for example.

Similarly, the TAC lacks factual support for the allegations that Wellgistics caused Athena and Crown to sell their rights in the Products and change their distribution processes. Even with Jenkins' prior connection to Alba and Jenkins advising Lion that Wellgistics was already "in the works" with distributors, it is not reasonable to infer that within a few days of learning the confidential information, Wellgistics caused the distributors to find a contract-counterparty, negotiate a deal, and close on the deals. Without factual support, it is also not reasonable to infer that Wellgistics, a relatively small wholesaler, could influence Athena and Crown in such a way. The timing of the disclosures coupled with the timing of Welgo learning of the changes made by Crown and Athena is not enough to infer that Wellgistics caused these fundamental commercial changes.

Because Welgo did not plead a breach of a contract for which it can seek redress and because it is not reasonably conceivable that Wellgistics caused the alleged harm to Welgo, Count I is **DISMISSED**.

---

[117] TAC, ¶ 18.

### 3. Tortious Interference

#### a. The parties' contentions

Welgo, LLC contracted with Crown and Athena. Because Welgo was not a party to those contracts, it now argues that it was a third-party beneficiary of the Welgo, LLC contracts. Therefore, Welgo asserts, it may pursue a tortious interference claim.

Wellgistics argues that Welgo did not plead a third-party beneficiary claim and therefore, the TAC fails to state a claim for tortious interference. Additionally, Wellgistics continues, there are no facts alleged (or argued in the brief) to satisfy the elements of third-party beneficiary.

#### b. Analysis

To assert a claim for tortious interference with a contract, a plaintiff must allege: "(1) a contract, (2) about which defendant knew, and (3) an intentional act that is a significant factor in causing the breach of such contract, (4) without justification, (5) which causes injury."[118]

> To qualify as a third party beneficiary, (i) the contracting parties must have intended that the third party beneficiary benefit from the contract, (ii) the benefit must have been intended as a gift or in satisfaction of a pre-existing obligation to that person, and (iii) the

---

[118] *Bhole, Inc. v. Shore Investments Inc.*, 67 A.3d 444, 453 (Del. 2013) (citation and emphasis omitted).

intent to benefit the third party must be a material part of the parties' purpose in entering into the contract.[119]

Welgo's claim fails for two reasons. First, the TAC does not allege that Welgo was a third-party beneficiary of the Welgo, LLC contracts. Supporting facts and allegations *must be in the pleading*, which cannot be supplemented through briefing.[120] There are no facts alleged in the TAC that the parties intended to benefit Welgo, that the contracts were a gift to Welgo, or that a pre-contract obligation existed.[121]

Second, merely owning the equity of a subsidiary does not make Welgo a third-party beneficiary of Welgo, LLC's contracts. Welgo argues that under *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.,*[122] a wholly-owned subsidiary is operated for the benefit of the parent, and thus, Welgo is a third-party beneficiary.[123] While it is true that the goal of having a wholly-owned subsidiary is to generate value for its parent,[124] it does not follow that the parent is automatically a third-party

---

[119] *Encore Preakness, Inc. v. Chestnut Health and Rehabilitation Group, Inc.*, 2017 WL 5068753, at *4 (Del. Super. Nov. 1, 2017) (quoting *Madison Realty Partners 7, LLC v. Ag ISA, LLC*, 2001 WL 406268 (Del. Ch. Apr. 17, 2001)).

[120] *See Dunn v. FastMed Urgent Care, P.C.*, 2019 WL 4131010, at *7 n.56 (Del. Ch. Aug. 30, 2019) (explaining that a "brief cannot patch pleading deficiencies"); *Intertek Testing Services NA, Inc. v. Eastman*, 2023 WL 2544236, at *4 .40 (Del. Ch. Mar. 16, 2023.

[121] *See id.*

[122] 906 A.2d 168 (Del. Ch. 2006).

[123] D.I. 66, p. 15.

[124] 906 A.2d at 173.

27

beneficiary of the subsidiary's contracts. Illustration 3 in Comment b to the *Restatement (Second) of Contracts*, § 302 is helpful here:

> B promises A to pay whatever debts A may incur in a certain undertaking. A incurs in the undertaking debts to C, D and E. If the promise is ... a promise that B will pay C, D and E, they are intended beneficiaries...; if the money is to be paid to A in order that he may be provided with money to pay C, D and E, they are at most incidental beneficiaries.[125]

Here, the purpose of the distributor contracts was to provide Welgo, LLC with medications at a certain price. The fact that Welgo, LLC paid Welgo some portion of Welgo, LLC's revenue from further sale of the medications makes Welgo, *at most*, an incidental beneficiary. Because Welgo was not a party to the Welgo, LLC contracts or an intended third-party beneficiary, Welgo fails to state a claim for tortious interference with a contract. Accordingly, Count III is **DISMISSED**.[126]

### 4. *Fraud*

#### a. *The parties' contentions*

In its answer to the Complaint, Welgo asserts as an affirmative defense that Wellgistics' actions, as described in the TAC, "were fraudulent as to" Welgo.[127] In the TAC, Welgo's fraud theory consists of two components: (1) Wellgistics never

---

[125] *Restatement (Second) of Contracts*, § 302, cmt. B, illus. 3 (1981) (June 2024 update).
[126] Count III also fails to state a claim for failure to plead damages for the reasons stated in the analysis of Count I. *See supra.*
[127] Because the Rule 12(f) and Rule 12(b)(6) standards are essentially the same, the Court is addressing the grounds for the motion to strike with the motion to dismiss.

intended to abide by the MCA because it wanted to exploit the confidential information for its own benefit; and (2) Wellgistics failed to inform Welgo that Wellgistics' products were on the Aberrant List and had Wellgistics done so, Welgo would not have disclosed the confidential information.

Wellgistics responds that Welgo's first theory is improper bootstrapping of a contract claim into a fraud claim and its second theory is fatally flawed because Wellgistics had no duty of disclosure.

**b.** *Analysis*

To state a claim for fraud, a party must allege:

> (1) the defendant falsely represented or omitted facts that the defendant had a duty to disclose; (2) the defendant knew or believed that the representation was false or made the representation with a reckless indifference to the truth; (3) the defendant intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted in justifiable reliance on the representation; and (5) the plaintiff was injured by its reliance.[128]

A claim for fraud may be based on representations in a contract, but the factual allegations of fraud must be separate from the factual allegations for breach of contract.[129] Additionally, damages arising from the alleged fraud must be separate

---

[128] *Everphone, Inc. v. Go Tech. Mgmt.,* LLC, 2023 WL 7996560, at *4 (Del. Super. Nov. 17, 2023) (citing *DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 958 (Del. 2005)).

[129] *AssuredPartners of Va., LLC v. Sheehan*, 2020 WL 2789706, at *10 (Del. Super. May 29, 2020); *Everphone, Inc.*, 2023 WL 7996560, at *8; *see also Black Horse Capital, LP v. Xstelos Holdings, Inc.,* 2014 WL 5025926, at *25 (Del. Ch. Sept. 30, 2014) ("'a plaintiff cannot 'bootstrap' a claim of breach of contract into a claim of fraud merely by alleging that a contracting party never intended to perform its obligations….'") (citations omitted).

29

from the alleged contractual damages.[130]

Welgo's first theory of fraud is bootstrapping. The factual predicate and alleged damages for the fraud claim are the same as the allegations supporting the breach of contract claim – Wellgistics used confidential information, which harmed Welgo.[131] Alleging that a contract counterparty did not intend to abide by the terms of a contract does not then turn the claim into one for fraud.[132] Rather, such claims must be pursued under whatever rights the complaining party has under the contract.

Welgo's second theory also fails. Welgo alleges that Wellgistics failed to disclose that some of Wellgistics' products were on the soon-to-be-released Aberrant List. Had Welgo known this information, the argument goes, it would not have disclosed the Welgo, LLC contracts to Wellgistics.

"Generally, there is no duty to disclose a material fact or opinion, unless the defendant had a duty to speak."[133] Welgo makes no argument (and provides no facts)

---

[130] *Earth Pride Organics LLC v. Corona-Orange Foods Intermediate Holdings, LLC*, 2024 WL 1905384, at *9 (Del. Super. Apr. 17, 2024); *Cornell Glasgow, LLC v. La Grange Properties, LLC*, 2012 WL 2106945, at *9 (Del. Super. June 6, 2012) ("Delaware courts have consistently held that to successfully plead a fraud claim, the allegedly defrauded plaintiff must have sustained damages as a result of a defendant's actions. And the damages allegations may not simply 'rehash' the damages allegedly caused by the breach of contract.") (citation omitted).

[131] *See* TAC, ¶ 98 ("Welgo relied on the false representations of Wellgistics, that it intended to be bound by the MCA…").

[132] *Black Horse Capital, LP,* 2014 WL 5025926, at *25.

[133] *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149 (Del. 1987); *See also Airborne Health, Inc. v. Squid Soap, LP*, 2010 WL 2836391, at *9 (Del. Ch. July 20, 2010) (citing *Prop. Assoc. 14 v. CHR Holding Corp.,* 2008 WL 963048, at *6 (Del. Ch. Apr. 10, 2008)) (holding that in the absence of a special relationship, one party to a contract is under no duty to disclose "'facts of which he knows the other is ignorant' "even if "'he further knows the other, if he knew of them, would regard

30

that Wellgistics had a duty to speak in this arms' length commercial transaction. Welgo argues that once Wellgistics made a partial disclosure, its duty to fully disclose was triggered.[134]  The "partial disclosure" Welgo relies on, however, is Wellgistics' execution of the MCA.  This is no disclosure at all, but rather a spin on Welgo's argument that Wellgistics never intended to abide by its contractual obligations.  Accordingly, Count IV is **DISMISSED** and the affirmative defense is **STRICKEN**.[135]

### 5. *Estoppel*

#### a. *The parties' contentions*

In its answer to the Complaint, Welgo asserts as an affirmative defense that Wellgistics' actions, as described in the TAC, were "such that [Wellgistics] should be estopped from prosecuting this action."[136]  In the TAC, Welgo asserts that when negotiating the Redemption Agreement, Wellgistics promised to stop selling the Products.  Because of this promise, Welgo entered into the Redemption Agreement.

Wellgistics makes two arguments for dismissal of the estoppel claim.  First, Welgo's claim fails as a matter of law because the integration clause in the

---

[them] as material in determining his course of action in the transaction in question'") (quoting Restatement (Second) of Torts § 551 cmt. a (1977)).

[134] D.I. 66, p. 17.

[135] Count IV also fails to state a claim for failure to plead damages for the reasons stated in the analysis of Count I.  *See supra.*

[136] Because the Rule 12(f) and Rule 12(b)(6) standards are essentially the same, the Court is addressing the grounds for the motion to strike with the motion to dismiss the estoppel count.

Redemption Agreement prevents any justifiable reliance on the alleged promise.[137]

Second, the TAC makes general allegations of a promise by Wellgistics, but it does not include factual details, as required by Rule 9(b).[138]

Welgo responds that it has sufficiently pled its claim for estoppel and that it justifiably relied on Wellgistics' promise. Welgo further argues that it would be unfair to enforce the Redemption Agreement because of an integration clause, but ignore Wellgistics' obligations under the MCA.[139]

### b. *Analysis*

#### i. *Estoppel elements*

To assert estoppel, the claimant must show that: (i) a promise was made; (ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; (iii) the promisee reasonably relied on the promise and took action to his detriment, and (iv) such promise is binding because injustice can be avoided only by enforcement of the promise.[140]

---

[137] D.I. 59, pp. 29-30.

[138] D.I. 59, p. 31.

[139] D.I. 66, p. 18.

[140] *Davis v. Town of South Bethany Beach*, 2022 WL 6646506, at *3 (Del. Super. Oct. 11, 2022) (citing *Lord v. Souder*, 748 A.2d 393, 399 (Del. 2000)); *Harmon v. Delaware Harness Racing Comm.*, 62 A.3d 1198, 1201 (Del. 2013); *Keating v. Board of Education*, 1993 WL 460527 (Del. Super. Nov. 3, 1993). *See also Delmar News, Inc. v. Jacobs Oil Co.*, 584 A.2d 531, 535 (Del. Super. 1990); *Borders v. Townsend Assocs.*, 2002 WL 725266, at *5 (Del. Super. Apr. 17, 2002).

### ii. *Does the integration clause bar the estoppel claim?*

"'Where the parties have made a contract and have expressed it in writing to which they both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understanding and negotiations will not be admitted for the purpose of *varying or contradicting the writing*.'"[141] Wellgistics argues that the Redemption Agreement's integration clause bars Welgo's estoppel claim, but Welgo is not seeking to vary or contradict the terms of the Redemption Agreement. Rather, Welgo is claiming that it would not have agreed to the Redemption Agreement had it known that Wellgistics would breach its promise to stop selling the Products. Accordingly, the integration clause does not bar the estoppel claim.

### iii. *Has Welgo sufficiently alleged a claim for estoppel?*

Under Rule 8(a), a claim or defense must be stated in a "short and plain statement."[142] An exception to Rule 8(a) is found in Rule 9(b)'s heightened pleading standard. Under Rule 9(b), "averments of fraud, negligence or mistake, the circumstances constituting fraud, negligence or mistake" must be stated with

---

[141] *Scott v. Land Lords Inc.*, 616 A.2d 1214 (TABLE), 1992 WL 276429, at *3 (Del. Sept. 22, 1992) (emphasis added) (quoting *Scott-Douglas Corp. v. Greyhound Corp.*, 304 A.2d 309, 315 (Del. 1973)); *Chrin v. Ibrix,* 2005 WL 2810599, at *5 (Del. Ch. Oct. 19, 2005) ("Thus, the court cannot reasonably allow the FED, an antecedent preliminary understanding, *to vary or contradict* the facially unambiguous SPA.") (emphasis added).
[142] Del. Super. Ct. Civ. R. 8(a).

particularity.[143]  While estoppel is subject to a heightened burden of proof at trial,[144] it is not among the claims/defenses that must be plead with particularity under Rule 9(b).[145]  Estoppel is not subject to Rule 9(b)'s heightened pleading standard.  Thus, the claim will not be dismissed for failure to plead with particularity.

In the context of a motion to dismiss under Rule 12(b)(6), the Court reviews the pleading to determine whether it asserts facts from which it is reasonably conceivable that the claimant could establish estoppel by clear and convincing evidence.[146]  "Clear and convincing" means to prove something "that is highly probable, reasonably certain, and free from serious doubt."[147]

The crux of Welgo's position is that Wellgistics improperly used confidential information, sold large quantities of the Products, causing Welgo to lose millions of dollars in value.  Welgo alleges that in negotiations over unwinding Wellgistics' stock purchase, Wellgistics assured Lion it would stop selling the Products.  It is not reasonable to infer that Welgo would obtain such a critical promise but not include

---

[143] Super. Ct. Civ. R. 9(b) ("In all averments of fraud, negligence or mistake, the circumstances constituting fraud, negligence or mistake shall be stated with particularity.").

[144] *See Davis*, 2022 WL 6646506, at *3.

[145] *See Hydrogen Master Rights, Ltd. v. Weston*, 228 F. Supp. 3d 320, 333 (D. Del. 2017) (referring to the estoppel allegations in the complaint, the court stated that while "'***[D]etailed factual allegations' are not required***, … a complaint must do more than simply provide 'a formulaic recitation of the elements of a cause of action.'") (emphasis added).

[146] *See In re TIBCO Software Inc. S'holders Litig.*, 2015 WL 6155894, at *14 n.48 (Del. Ch. Oct. 20, 2015) (noting that on a motion to dismiss a claim that requires proof by clear and convincing evidence, the legal standard is whether the complaint alleges facts from which it is reasonably conceivable that the plaintiff could establish its right by clear and convincing evidence).

[147] *Hudak v. Procek*, 806 A.2d 140, 147 (Del. 2002) (quoting Superior Court Civil Pattern Jury Instruction on clear and convincing as a proper articulation of the standard).

34

that promise in its written contract. Welgo is essentially looking to estoppel as a way to obtain a benefit that it failed to secure for itself at the drafting table. It is not reasonably conceivable that Welgo will be able to prove by clear and convincing evidence that injustice can be avoided only by enforcing this alleged promise. Accordingly, Count V is **DISMISSED** and the affirmative defense is **STRICKEN**.

## B. *Court of Chancery claim*

### 1. *The parties' contentions*

Welgo makes three arguments in support of its breach of fiduciary duty claim. First, Pearce breached his duty of loyalty by taking no action to prevent Wellgistics from misusing the confidential information and that he effectively "sat back" and watched his principal "drain the value" from Welgo. Thus, Wellgistics is responsible for its agent's (Pearce) inaction. Second, because Pearce owed fiduciary duties to Welgo as a director and he was Wellgistics' agent, Wellgistics is therefore cloaked with the same fiduciary duties, which it breached by misusing the confidential information. Third, as a majority stockholder, Wellgistics owed fiduciary duties to Welgo, which Wellgistics then breached by misusing the confidential information. Welgo argues that these actions caused the same damages asserted in its breach of contract claim – due to the increase in the national utilization rate and subsequent actions of insurers reducing or eliminating coverage for Welgo, LLC's Products, Welgo was damaged.

Wellgistics counters that the claim must be dismissed because the complaint does not actually allege a breach of fiduciary duty, and it is improper for Welgo to rely on allegations in the Superior Court TAC.

Further, Wellgistics continues, even if the Court considers the allegations in the TAC, the complaint fails to adequately allege agency. While Pearce was Wellgistics' agent for purposes of purchasing the Welgo stock, Wellgistics argues that there are no allegations that he was Wellgistics' agent *as a director*. Also, there are no allegations in the complaint to rebut the presumption that directors are independent.

Finally, Wellgistics argues that the complaint does not adequately allege that it owed fiduciary duties as a stockholder. The complaint does not allege that Wellgistics owned more than 50%, so it cannot be a majority owner, and further, it argues, the complaint is devoid of allegations that Wellgistics controlled the Welgo board.

### 2. *Analysis*

To state a claim for breach of fiduciary duty, a plaintiff must allege that the defendant owed a fiduciary duty and that he breached that duty.[148] Directors of a Delaware corporation owe fiduciary duties to the company and its stockholders.[149]

---

[148] *Maka v. Musial*, 2024 WL 2374483, at *3 (Del. Ch. May 23, 2024).
[149] *See Gantler v. Stephens*, 965 A.2d 695, 708-09 (Del. 2009); *McRitchie v. Zuckerberg*, 315 A.3d 518, 537, 543, 546 (Del. Ch. 2024).

36

A stockholder may act in its own self-interest without the constraints of fiduciary duties,[150] except when the stockholder owns voting control, or it owns less than a majority *and* it controls the board.[151] When a plaintiff's allegations are based on the stockholder owning less than a majority, the plaintiff must plead facts to support a reasonable inference that the alleged controller possessed "(i) control over the corporation's business and affairs in general or (ii) control over the corporation specifically for purposes of the challenged transaction."[152]

Welgo alleges that Pearce, as a director of Welgo, owed fiduciary duties to the company.[153] Welgo argues in its brief that Pearce breached this duty when he took no action to prevent Wellgistics from misusing Welgo's confidential information. Welgo, does not, however, make any such allegation in its complaint. Factual allegations not asserted in the complaint cannot be asserted through the party's briefing.[154]

---

[150] *Skye Mineral Investors LLC v. DXS Capital (U.S.) Ltd.*, 2020 WL 881544, at \*26 (Del. Ch. Feb. 20, 2020).

[151] *Sciannella v. AstraZenca UK Limited*, 2024 WL 3327765, at \*16 (Del. Ch. July 8, 2024) ("Delaware courts 'will deem a stockholder a controlling stockholder when the stockholder: (1) owns more than 50% of the voting power of a corporation or (2) owns less than 50% of the voting power of the corporation but *exercises control* over the business affairs of the corporation.'").

[152] *Id.* ("'To plead that the requisite degree of control exists generally, a plaintiff may allege facts supporting a reasonable inference that a defendant or group of defendants exercised sufficient influence 'that they, as a practical matter, are not differently situated than if they had majority voting control.'").

[153] D.I. 1, ¶ 43.

[154] *See Dunn v. FastMed Urgent Care, P.C.*, 2019 WL 4131010, at \*7 n.56 (Del. Ch. Aug. 30, 2019) (explaining that a "brief cannot patch pleading deficiencies"); *Intertek Testing Services NA, Inc. v. Eastman*, 2023 WL 2544236, at \*4 n.40 (Del. Ch. Mar. 16, 2023).

Even if the Court considered this argument, the complaint fails to identify a breach by Pearce, which is a necessary predicate under Welgo's theory. First, there are no factual allegations, in the complaint, the TAC, or Welgo's brief, that Pearce was even aware of Wellgistics' alleged misuse of the confidential information. Even if he was aware, there are no factual allegations that he controlled Wellgistics or could have stopped the alleged misuse. Indeed, Welgo's allegations are the opposite – it alleges *Wellgistics* controlled *Pearce*.[155]

The case Welgo relies on, *Skye Mineral Investors LLC v. DXS Capital (U.S.) Ltd.,*[156] also does not support its theory. In *Skye Mineral*, the director-defendant shared information regarding the value of the company's assets with his affiliates, but did not share this information with the other directors. Armed with information that the assets were worth far more than anticipated, the director-defendant ordered management to take actions that impeded the company's ability to meet its financial obligations, he participated in a lawsuit with the intention of blocking much-needed company financing, and he lied to the board about his involvement in negotiating the affiliates' purchase of the loan from the company's secured lender. This was part of a scheme to force the company into bankruptcy, which would (and did) allow

---

[155] TAC, ¶¶ 32-33; *see also Skye Mineral,* 2020 WL 881544, at *23 ("A defining feature of the principal-agent relationship is the principal's *right to control* the agent's conduct.") (emphasis in original).
[156] 2020 WL 881544 (Del. Ch. Feb. 20, 2020).

the affiliates to purchase the assets as the secured creditor, at a steep discount. The plaintiff's theory was bolstered by an email from the director-defendant that disclosed the scheme to "sit back," wait for the company's collapse, and as the first-lien holder, "buy it out of bankruptcy very cheap."[157]

Unlike the director in *Skye Mineral*, there are no allegations that Pearce took *any actions as a director*. There are no allegations of a scheme by which Pearce used his position as a director to assist Wellgistics harm Welgo. Simply asserting that Pearce "sat back" and watched as Wellgistics devalued the company is insufficient to state a claim.

Welgo's theory that Wellgistics owed its own fiduciary duties by virtue of Pearce being its agent, also fails. Even assuming that the complaint sufficiently alleged that Pearce was Wellgistics' agent as a director, Welgo offers no legal authority that imposes fiduciary duties on a third-party just because its agent served as a director. Such a theory would run contrary to the nature of directors' fiduciary duties, which were developed from a concept that "rested on the fact that stockholders entrusted their capital to the firm, which the directors had virtually plenary power to manage."[158] As Welgo would have it, fiduciary duties would be

---

[157] *Skye Mineral,* 2020 WL 881544, at *6.
[158] *McRitchie*, 315 A.3d at 557. (detailing the history of the development of the law of directors' fiduciary duties).

imposed on any principal of a director, despite the alleged principal having no ability to make decisions for the corporation. There is no legal basis for Welgo's theory.

Finally, Welgo argues that the definition of a "minority" stockholder is one who owns *less than* 50% of the stock. Because Wellgistics cannot be a minority stockholder (as it owns 50%), the argument goes, Wellgistics must be a majority holder. Even if Welgo's theory is accepted, there are no allegations that Wellgistics, as a stockholder, exerted any control over Welgo. The complaint fails to sufficiently allege that Wellgistics owed a fiduciary duty to Welgo. Accordingly, the complaint is **DISMISSED**.

## V. CONCLUSION

Because Welgo failed to allege any reasonably conceivable circumstances under which it is entitled to recover under its claims in the TAC, Wellgistics' Motion to Dismiss is **GRANTED**. Because Welgo has already amended its counterclaim three times, the TAC is dismissed **with prejudice**.

Because Welgo failed to plead legally sufficient affirmative defenses Wellgistics' Motion to Strike is **GRANTED**, and the affirmative defenses are stricken **with prejudice**.

The Court of Chancery complaint fails to state a claim and therefore Wellgistics' Motion to Dismiss is **GRANTED**.  Under Rule 15(aaa), the dismissal is **with prejudice**.

**IT IS SO ORDERED**.

/s/Kathleen M. Miller
Kathleen M. Miller, Judge